## THE HIGHLAND LIGHT.

(Circuit Court of Appeals, Ninth Circuit. September 9, 1901.)

### No. 664.

SHIPPING—LOSS OF GOODS THROUGH NEGLIGENCE OF CHARTERER—LIABILITY OF VESSEL.

A bark was chartered to a transportation company for a monthly hire, the charter providing that the company should have all available cargo space, should do all lightering, and be responsible for all damage or loss of cargo. Libelants, with knowledge that the vessel was chartered, contracted with the company for the transportation of goods from Seattle to Dawson on the bark, "or any other vessel of the company, or on board of any vessel the company may employ," and to be shipped from St. Michaels up on the company's river boats. The goods were laden on the bark, which took them to St. Michaels. On reaching there it was found that the company had provided no means of lighterage, had no river vessels to forward the goods, and there was no warehouse in which they could be stored, or person to receive them. After remaining there several weeks, by using the small boats and constructing lighters, the passengers and their effects and such cargo as there was any one to receive were landed, and the master returned to Seattle with libelants' goods on board. *Held*, that while the company was liable for the damages caused by its gross negligence, there was no ground upon which the bark could be charged with negligence or liability for the breach of the company's contract.

Appeal from the District Court of the United States for the Northern Division of the District of Washington.

Gorham & Gorham and Chas. E. Naylor, for appellants.

Upton, Arthur & Wheeler and Seymour W. Condon, for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. The proceeding in which the decree appealed from was rendered was commenced in the court below by the filing of a libel by Charles P. Pettey against the bark Highland Light, her tackle, apparel, and cargo, the Seattle, St. Michaels & Dawson City Transportation & Trading Company, a corporation, Thomas F. Townsley, E. W. Price, A. B. Graham, and Thomas H. Dempsey, as defendants, to recover for the alleged breach of a contract for the delivery at Dawson City, on the Yukon river, certain freight of his, shipped from Seattle, Wash., on board the Highland Light, in which proceeding William McCord and George W. Britain intervened and filed separate libels against the same defendants to recover for the alleged breach of a contract to deliver at Dawson certain freight of theirs put on board the bark at Seattle. The record shows that the bark Highland Light was, on the 20th day of January, 1898, chartered by its managing owner, George E. Plummer, of Alameda, Cal., to T. F. Townsley, of Seattle, Wash., for a period during which the occurrences here in question took place, and for voyages between Seattle, Wash., and St. Michaels, Alaska, at a stipulated sum per month, to be paid by the charterer to the owner of the bark. Among the provisions of the charter party are the following:

"Second. That said party of the first part (the owner) does further engage that the whole of said vessel (with the exception of the cabin, and necessary room for the accommodation of the crew and the stowage of the sails, cables, and provisions) shall be at the sole use and disposal of the said party of the second part (the charterer) during the voyage and/or voyages aforesaid; and that no goods or merchandise whatever shall be laden on board otherwise than from the said party of the second part. * * * Fourth. It is also further understood and agreed that the crew of the said vessel shall be used to handle cargo, as is customary on the Pacific coast, but that all lighterage of cargo and all extra labor employed in the handling of the cargo and/or cargoes taken on board of the said vessel shall be at the expense of the party of the second part, and all cargo and/or cargoes shall be delivered to and received from ship tackles alongside of said vessel. And it is also further understood and agreed that any and all claims for shortage of and/or damage to any cargo and/or cargoes carried by the said vessel shall be settled and paid for by the said party of the second part."

The charter party was subsequently assigned by Townsley to the Seattle, St. Michaels & Dawson City Transportation & Trading Company, a corporation, of which Townsley was the manager, Dempsey treasurer, Price president, and Graham vice president. The business of that corporation is indicated by the following advertisement published by it in one of the newspapers of Seattle, introduced in evidence, just prior to the application of the libelants to it for the transportation of their freight to Dawson:

"Added to Alaska's Fleet.
"An Ocean Steamship, Two River Boats, and Four Barges.
"New Company in the Field.
"Seattle, St. Michaels & Dawson City Transportation & Trading Company Charters Bark Highland Light, Preparatory to Engaging Heavily in Alaska Freight and Passenger Trade. Capital, $100,000.

"Another has been added to the list of Alaska steamship enterprises, having been organized by some of the most solid and conservative capitalists in Seattle. A large bark is under charter, and within a week contracts will be let for the construction of one ocean steamer, two river steamers, and

four barges, to operate between Seattle and Dawson. The company is the Seattle, St. Michaels and Dawson City Transportation and Trading Company, and it has a cash capital of $100,000. The officers are: President, E. W. Price; vice president, A. B. Graham; treasurer, Flavius S. Cole; secretary. T. H. Dempsey; manager, T. F. Townsley. It is a close corporation, and intends to engage permanently in the Alaskan transportation business, as well as in trading and mining on the Yukon. The company has chartered for eight months the bark Highland Light, of 2,200 tons freight capacity, which is due here any hour. It will load freight and stock for Skagway and Dyea, and will continue on that run until May 1, when it will be loaded with freight and passengers for St. Michaels. Meanwhile plans and specifications are being prepared by E. L. McAllaster, the marine architect, for one ocean steamer, two river steamers, and four barges, for which contracts will be let next week, and which will be completed ready for service by June 1. The ocean steamer will be 212 feet long, 32 feet beam, and 23 feet deep, and will have a capacity for 1,000 tons of freight and at least 300 passengers. The river steamers will be modeled after those running on the Mississippi river, and will be 150 feet long and 30 feet wide, with a capacity of 300 tons of freight and 300 passengers each. The barges will be 125 to 150 feet long, and will have a freight capacity of 250 to 300 tons each. All the steamers will have steam winches and all modern conveniences, including electric light, marble baths, etc. Bids for the machinery are now being made by several houses in the East, but the boats and all other fittings will be built in Seattle. As soon as navigation on the Yukon river opens, the Highland Light will be transferred to the St. Michaels route, and, with the ocean steamer, will run in connection with the river boats. The Highland Light has already secured almost a full cargo for her first trip to Lynn Canal; and contracts for freight to St. Michaels are being made so rapidly that it may be decided to add to the river fleet. The cost of the fleet so far provided will be $125,000, which is more than the capital of the company, but its financial backers are amply able to enlarge it without associating any others with them. The Highland Light has just come off the Merchants' dry dock at San Francisco, where she has been thoroughly overhauled. The freight space in her hold has been enlarged. Upon returning to Seattle the bark will be fitted up for a voyage to the mouth of the Yukon river with the sections of four barges and two river boats to be put together on Hooper's Bay, and made ready for operation on the Yukon in the spring."

The libelants, desiring to go to Dawson for mining purposes, and perhaps attracted by this grandiloquent advertisement, applied early in June, 1898, to this transportation company to carry their provisions and mining outfits to that place, which the company undertook to do, giving to each of the libelants a bill of lading, dated May 2, 1898, reciting the receipt of the property, describing it, with its weight, address, and destination, and stating that it was "to be shipped on board of the Highland Light—Dawson City—Canada, or on board of any other vessel of the company, or on board of any vessel the company may employ," and further providing that it was "to be shipped to Dawson on our first river boat from St. Michaels up. Duties to be paid here by shippers," and with various other provisions common to such instruments. The libelants then proceeded to Dawson by way of Skagway and the overland route, expecting to receive their provisions and outfits at that place. The transportation company shipped them on board the Highland Light to St. Michaels, at which point it was necessary to transfer them to lighter craft for carriage thence to Dawson. When the Highland Light left Seattle with the charterer's passengers, numbering more than 100, and a cargo of about 1,200 tons of freight, including that of the libelants,

she carried on board but one representative of the charterer, and that was the purser, who, two days after the bark reached St. Michaels, left her, and attached the coal on board for wages alleged to be due him from the transportation company. The latter had made no arrangements whatever for the landing of its passengers and freight at St. Michaels, nor for the forwarding of either passengers or freight to their points of destination. That company's neglect in this respect naturally gave rise to serious loss, inconvenience, and dissatisfaction on the part of the passengers, as well as on the part of the captain of the bark; and as the best, and apparently the only, way for temporary relief, the captain and passengers, after waiting several days for the performance of the company's obligations, combined for the landing of the passengers and as much freight as possible by means of the small boats of the bark and such lighters as could be and were constructed out of lumber carried by the bark. This method was pursued as expeditiously as possible, the freight of the passengers being delivered to them by the captain upon the surrender to him of the bills of lading held therefor. In the midst of this proceeding Dempsey appeared at St. Michaels on board the steamer Del Norte, with a little steam launch capable of carrying about a dozen passengers and about 30 tons of freight, but unfit, according to the evidence, to carry even those up the Yukon river. It is contended that he was sent by the transportation and trading company to St. Michaels to take the passengers and freight from the Highland Light, and carry out the contracts of that company for the transportation of both on to destination; and that he had with him an order from Townsley, as manager of the company, on the captain of the bark, for the delivery to him of certain supplies of the company, and also all of the freight, including that of the libelants; which order, in so far as concerned the freight of the libelants, the captain refused to comply with, but retained that freight on board, and brought it back to Seattle in a damaged and practically worthless condition. In the first place, we think the probabilities are all against the truth of that contention. The value of the libelants' property was, according to the evidence and the findings of the court below, $107 · in Seattle at the date of its shipment, on which the libelant paid to the transportation company $294 for freight charges, duties, etc.; the value of the intervening libelant McCord's property was $200 at Seattle at the date of its shipment, on which he paid the transportation company $150 for freight charges, duties, etc.; and that of the intervening libelant Britain was $300 at the same place and time, on which he paid to the transportation company $195.45. The evidence shows without conflict that the captain delivered all of the freight of all of the passengers upon the surrender of the bills of lading therefor held by them, and that he delivered to Dempsey the supplies specified in the order presented by him from the manager of the transportation company; and it would seem very unreasonable to expect to find that he refused to deliver to Dempsey the few provisions and outfits of the libelants if they had been called for by the order, as the captain would very naturally be anxious to free his ship of all the freight he had taken to St. Michaels. He had nothing to gain by bringing a por-

tion of it back to Seattle, as the evidence shows he did that of the libelants. What the order given by Townsley, as manager of the transportation company, to Dempsey, and by him presented to the captain at St. Michaels, contained, is in dispute, and the testimony in relation thereto conflicting. None of the testimony in the case was given before the court, but all of it that was presented to the court below was taken either before a commissioner or by deposition. In this court some additional evidence has been introduced in the form of the deposition of Carl Ackerman, a witness on behalf of the appellants, who was the first officer of the bark on its voyage from Seattle to St. Michaels and return. Turning to the testimony of Dempsey himself in respect to the contents of the order given him by Townsley, as manager of the transportation company, and by Dempsey presented to the captain of the bark, we find it very indefinite, uncertain, and unsatisfactory. We extract from his cross-examination in regard to the order:

"Q. Now, did you take that order with you on the Del Norte from Seattle? A. Yes, sir; I took the order from here. Q. In going? A. Yes, sir; and I presented the order to Captain Herbert on the ship. Q. What ship? A. On the Highland Light. Q. When? A. Well, within a few days of when I landed. It might have been the first day. I think it was the first day, because in the order it stated that I was to have, among other things, a range which was used on the Highland Light, and a lot of cooking utensils, for my camp, bedding and furniture of that kind; and I was to get it; and I presented the order as soon as I went there. Q. Is it not a matter of fact, Mr. Dempsey, that that order that you refer to was an order upon Captain Herbert from Mr. Townsley for the company's supplies and goods on the Highland Light? A. No. Q. Is not that the fact? A. Well, it was for certain supplies that were to be given me, and that I would represent them. Q. In taking the supplies you represented the company? A. Yes, sir; I did the lightering and the taking care of the goods. Q. There was no order given you by Townsley upon Captain Herbert for the goods other than the merchandise and supplies of this company, was there? A. Yes, sir; I think there was an order given me for the goods that— That I would do the lightering. Q. What goods? A. For all of the freight, and I would take care of it. Q. The whole cargo on the Highland Light? A. The freight which was to go up the river. Q. The whole of it? A. Such as we would take care of, that I would do the lightering. Q. You had an order for all of the through freight on the Highland Light? A. Yes, sir. Q. Which included the supplies and goods of this company, as well as the goods shipped by private individuals? A. No; I had an order to take care of the goods generally and the freight on the boat. Q. Which included the supplies and goods of this company as well as the goods shipped by private individuals? A. Only part of the company's, because Mr. Nestor, he had another order for part of the company's goods. Q. Now, which part of the goods did you have an order for? That is what I am trying to get at. A. I had an order for a certain range which was on the Highland Light. Q. What else? A. Certain mattresses and cooking utensils. Two scows, and I cannot— Let me see. And as much coal as was necessary. I cannot recollect whether there was anything else or not. Q. Would not you know whether there was anything else? A. Well, it is so long now. That is the most of it, though. Q. You think that is the most of it,—a range, and some mattresses, and cooking utensils, and some coal? A. Yes, sir. Q. You think that was all that the order was for? A. Yes, sir. And supplies were sold, I understand, from Mr. Nestor— Q. Now, you are satisfied, are you, with what you have enumerated? A. To the best of my memory. Q. To the best of your memory. All of the things described in that order which you were entitled to receive? A. Well, the receipt, of course, or the order, if I had it— There are so many things, I would not be sure. Q. But you think you have included

all? A. I think that was about all, but there might be some little things. Q. I did not say there might not be one or two more little articles. A. Oh, that was in a general way. Q. That is practically what the order was for? A. Yes, sir. Q. And for nothing else? A. Well, I could not remember just now whether there was something else on it or not."

We have not overlooked Townsley's testimony to the effect that he gave Dempsey an order on the captain of the bark for all the freight; but, in view of the clear and explicit statements of Ackerman, the first officer, and of the captain, and considering all of the circumstances of the case, we are unable to conclude that such was the purport of the order. It does not admit of question that the transportation company wholly failed in its duty to make timely and suitable provision for the discharge of its passengers and freight at St. Michaels, and the forwarding of the same to the respective points of destination. Dempsey did not even appear at St. Michaels until about two weeks after the Highland Light arrived there. It seems almost absurd to contend that he was sent to that point for the purpose of discharging the bark of its more than 100 passengers and its cargo of about 1,200 tons of freight, and carrying them up the Yukon river by means of the little launch that he took with him. He was provided with no means with which to secure tugs, lighters, or other means of even discharging passengers or freight, much less with steamers or barges for the forwarding of them to their destinations. The testimony of Ackerman, which, as has been said, was not before the court below, appears to have been given in a very straightforward manner. What was done upon the arrival of the bark at St. Michaels, which was on the 4th day of July, appears from this extract from his testimony:

"The passengers' contract called for a tug and scow ready on our arrival at St. Michaels, but they were not there when we got off, so at first the passengers did not know how to get their things ashore. They held a meeting in the ship's cabin, and invited the captain and myself to be present, and wanted to know what was to be done,—how they would get their freight ashore? They concluded that the only thing to get it ashore would be to help themselves, and Captain Herbert was willing to lend them the ship's boats to get their things ashore until a lighter was built to carry more than the ship's boats. So the next morning all the freight in the hold was separated according to their marks, and they commenced to ship it ashore in the ship's boats. At the same time some of the sailors broke down the starboard side of the deck house, rafted the lumber ashore, and some of the carpenters (five) amongst the passengers built a scow out of that lumber. The material outside of the lumber was furnished by the Chicago Company. We continued to send their freight ashore in the ship's boats until all the separate companies had enough provisions, tents, and tools ashore to commence working on their own boats, for which we had the lumber aboard of the ship. Then we rafted the lumber, and they commenced building their boats. After we had the lumber ashore, the scow was finished. We loaded her up, sometimes twice a day, and towed her ashore, also with the ship's boats. At that rate we lightered about 350 tons a week; that is, by sending the scow ashore two or three times a day."

Dempsey did not arrive at St. Michaels until about the 26th or 27th of July, going there on the steamer Del Norte, at which time, according to Ackerman's testimony, more than two-thirds of the 1,200 tons of freight that the bark carried had been discharged. After his arrival he towed, by means of his launch, a number of light-

ers ashore, for which, according to the testimony of Ackerman, he demanded and received pay from the passengers. Both Ackerman and the captain of the bark testify distinctly that Dempsey said that the transportation company had broken up, and that he had lost money by it; that he was up there to make some money for himself, and that he had no more connection with the company; that on the day of his arrival he presented an order from the manager of the transportation company for the delivery to him of certain articles, embracing dishes, knives and forks, cooking utensils, lamps, one range, and other things; but that the order did not call for any other freight. In the surrounding circumstances, which clearly show, among other things, that Dempsey was not provided by the transportation company with any means, and had none of his own, with which to forward the freight of the libelants or any other freight of the bark's cargo to Dawson, we find strong corroborative evidence of the truth of the testimony of the captain and of the first officer of the bark to the effect that Dempsey presented no order for the freight of the libelants; and we are of opinion that from his statements to the captain and his circumstances the captain was justified in refusing to deliver to him the provisions and outfits of the libelants. There being no one at St. Michaels authorized to receive them, and no place of storage there, there was nothing left for the captain to do but to bring the property back to Seattle with his ship, which he did. For the transportation company's gross neglect in the matter it is, as a matter of course, liable to the libelants, and from the judgment against it no appeal appears to have been taken; but we are unable to see any just ground upon which the judgment against the ship can be sustained. The case shows clearly that the libelants' goods were carried by the bark under a charter party giving to the Seattle, St. Michaels & Dawson City Transportation & Trading Company the whole capacity of the ship; that the libelants had notice of this fact, and therefore constructive notice, at least, of the terms of the charter party, including the provision that "any and all claims for shortage of and/or damage to any cargo and/or cargoes carried by the said vessel shall be settled and paid for by the said party of the second part" (the charterer), and contracted, not with the master or owner of the ship, but with the charterer, in the form of a bill of lading giving to the transportation company the right to ship the goods on board of the Highland Light, "or on board of any other vessel of the company, or on board of any vessel the company may employ." It so happened that the transportation company did ship the libelants' goods on the Highland Light, but the latter did not thereby become liable for the due performance of the charterer's contract, as was held by the court below. As there was no breach of duty on the part of the ship or of its owner or master, the judgment against it must be reversed.

The judgment, in so far as concerns the appellants, is reversed, with costs.